UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Stephanie Martel, as Administrator
for the Estate of Robert Martel

       v.

Hillsborough County, et al.

Civil No. 1:21-cv-880-JL
Opinion No. 2022 DNH 130

**MEMORANDUM ORDER**

In a lawsuit stemming from an unfortunate inmate death at the Valley Street Jail, the
defendants ask the court to test the allegations in the complaint against the demanding standards
for constitutionally inadequate medical care, Monell liability[1], and government employee
immunity.  Robert Martel reported to Valley Street for a brief incarceration and began
experiencing alcohol withdrawal symptoms soon thereafter.  After receiving medical treatment
from the Jail's nursing staff, Martel was later found unresponsive in his cell and died
unexpectedly.  Martel's Estate filed suit against Hillsborough County (the municipal entity that
operates Valley Street), three County nurses who treated Martel during his incarceration, and a
correctional officer who briefly interacted with Martel (the "County Defendants").  The Estate
later amended its complaint to add the Jail's outside medical providers as defendants (the
"AIMG Defendants").  This court has jurisdiction over the plaintiff's federal claims under 28
U.S.C. §§ 1331 and 1343 because the claims present federal questions and arise from federal
civil rights statutes, and supplemental jurisdiction over its state law claim under 28 U.S.C. §
1367(a).

---

[1] See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) (municipality may be liable under
§ 1983 for "action pursuant to official municipal policy of some nature," or municipal custom or
practice that "caused a constitutional tort").

The individual defendants move to dismiss the plaintiff's complaint, arguing that the well-plead factual allegations, and all reasonable inferences drawn therefrom, cannot support claims for deliberately indifferent (and thus constitutionally inadequate) medical care.[2]  The County further argues that absent an underlying constitutional violation by one of its employees, the plaintiff's municipal liability claim is unsustainable.  As to the negligence claim, the nurses argue that the factual allegations show that they believed in the legality of their actions, and they are therefore immune under N.H. RSA § 507-B:4, while the AIMG Defendants ask the court to decline to exercise supplemental jurisdiction over this claim.

After considering the parties' submissions and twice hearing oral argument, the court grants the motions as to the federal claims.  The allegations against the individual defendants at most show a disagreement as to Martel's course of treatment, as opposed to purposeful denial of care, delayed care, lack of care intended to punish Martel, or care so inadequate that it amounts to a refusal of care.  Disagreements over appropriate medical care, and "misjudgment, even negligent misjudgment, [are] not deliberate indifference."  Ramos v. Patnaude, 640 F.3d 485, 490 (1st Cir. 2011).  And, aside from unsupported legal conclusions or speculation, the plaintiff has failed to plead sufficient facts to sustain a deliberate indifference claim against the AIMG Defendants under theories of supervisory liability or willful blindness.  Moreover, absent an underlying constitutional tort or violation, the plaintiff's municipal liability claim against the County must be dismissed.  Finally, because the court is dismissing the plaintiff's federal claims at an early stage of the litigation, it declines to continue exercising supplemental jurisdiction over the state law negligence claim and dismisses that claim without prejudice.

---

[2] See Doc. no. 18 (County Defendants' Motion); Doc. no. 42 (AIMG Defendants' Motion).

## I.      Applicable legal standard

To defeat a Rule 12(b)(6) motion, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015).  This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013).  In ruling on such a motion, the court accepts as true all well-pleaded facts set forth in the complaint and draws all reasonable inferences in the plaintiff's favor.  See Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010).  The court may also consider judicially noticed documents, matters of public record, and documents introduced by the plaintiff in her objection to the motion to dismiss or concessions in that objection, without converting the 12(b)(6) motion into a motion for summary judgment.  See Breiding v. Eversource Energy, 939 F.3d 47, 49 (1st Cir. 2019); Greene v. Rhode Island, 398 F.3d 45, 49 (1st Cir. 2005).

## II.     Background

The court draws the relevant factual background from the plaintiff's Second Amended Complaint.[3]

On May 7, 2021, Martel was ordered to serve a 10-day sentence at Valley Street Jail in Manchester, New Hampshire.[4]  The County operates, and houses detainees and inmates at Valley Street, and employs correctional officers, nurses, and other staff there.  At the time of Martel's

---

[3] See doc. no. 41.  While the County Defendants' motion to dismiss was pending, the court granted the plaintiff's motion for leave to file a second amended complaint.  See July 19, 2022 Endorsed Order.

[4] For reasons unimportant to the resolution of this motion, Martel's sentence was reduced to six days.

incarceration at Valley Street, the County contracted with American Institutional Medical Group, LLC to provide medical care to inmates and detainees at Valley Street.[5]  AIMG was then comprised of Christopher Braga, M.D. and Christopher Schwieger, PA-C.  PA Schwieger has since passed away and the plaintiff is suing his estate in this lawsuit.

Around 6:00 pm on May 10, Martel reported to Valley Street to serve his sentence.[6] Several hours later, Defendant Bryanna Gue, RN screened Martel during the booking process.[7] During the screening, Martel told Nurse Gue that he drank a bottle of vodka per day, and had consumed a bottle of vodka earlier that day.[8]  Martel then signed a consent to treatment form, which authorized County medical providers and their subcontractors to provide medical treatment to Martel.[9]  Nurse Gue did not obtain Martel's medical history, physically assess him, take his vital signs, complete a screening assessment or "problem list," or conduct a "Clinical Institute Withdrawal Assessment for Alcohol" (CIWA) during Martel's booking.[10]  Nurse Gue

---

[5] Doc. no. 41 at ¶ 79.  The AIMG providers took on a number of duties under the contract, including delivering and maintaining reasonable and medically necessary medical care to Valley Street inmates and detainees – in accordance with national care standards and the County's policies and procedures – assisting (upon request from jail administrators) in the development of clinical policies, protocols, and procedures, and spending at least 12 hours per week at the jail. Id. at ¶¶ 80-84.

[6] Id. at ¶ 21.

[7] Id. at ¶ 22.

[8] Id.

[9] Id. at ¶ 23.

[10] Id. at ¶¶ 24-25.

noted that Martel was not "apparently under the influence of alcohol or drugs" and was not "showing signs of withdrawal" at that time.[11]

Nurse Gue nevertheless placed Martel on detoxification watch or "detox watch" at approximately 10 pm that night.[12]  When an inmate is placed on detox watch, the nursing staff and corrections officers must "closely and frequently" monitor the inmate and assess symptoms and vital signs to determine whether further medical intervention is required.[13]  After placing Martel on detox watch, Nurse Gue did not assess his symptoms or take his vital signs.[14]  Nor did she contact Dr. Braga or PA Schwieger.[15]  Instead, she instructed that Martel not use the gym or engage in other recreation yard activities.  She also arranged for him to have a lower bunk and a mattress for the floor due to seizure concerns.[16]  After booking, Jail officials placed Martel in the unit where detox-watch inmates are housed.[17]

Defendant Erica Gustafson, LPN next visited Martel just after midnight on May 11.[18]  She noted that Martel was at risk for detox, but he refused to have his vital signs taken and refused a "CIWA" assessment.[19]  Nurse Gustafson's notes do not show that she informed Martel

---

[11] Id. at ¶ 26.

[12] Id. at ¶ 27.

[13] Id. at ¶¶ 28-29 (citing the Jail's "Detox Procedures").  Dr. Braga reviewed the Jail's detox procedure and withdrawal protocols and deemed them appropriate.  Id. at ¶ 30.

[14] Id. at ¶ 31.

[15] Id. at ¶ 32.

[16] Id. at ¶ 31.

[17] Id. at ¶ 33.

[18] Id. at ¶ 34.

[19] Id. at ¶ 35.

of the potential adverse medical consequences of his refusal to be assessed.[20]   Eight hours later, an unidentified nurse visited Martel's cell and he again refused to be assessed for alcohol withdrawal and refused to have his vital signs taken.[21]

Defendant Katelyn Hrubiec, LPN checked on Martel around 9:40 am.   She observed him experiencing symptoms of alcohol withdrawal, including sweating, agitation, and restlessness.[22] Martel told Nurse Hrubiec that he struggled with chronic alcohol abuse, drank 750 mL of Vodka each day, and had consumed that amount on the day he reported to Valley Street.[23]   Martel also informed Nurse Hrubiec that he used fentanyl daily and experienced serious withdrawal problems when he stopped using drugs.[24]   Nurse Hrubiec then took Martel's vital signs and assessed his withdrawal symptoms using the CIWA scale.   She noted that Martel was sweating profusely, becoming increasingly agitated, and experiencing chills and tremors.   Nurse Hrubiec assigned Martel a CIWA score of 13, which indicated that he was experiencing mild to moderate withdrawal.[25]   She also noted that Martel was experiencing Stage 1 hypertension.[26]   Following

---

[20] Id.

[21] Id. at ¶ 36.

[22] Id. at ¶ 37.

[23] Id. at ¶ 38.

[24] Id. at ¶ 39.   The plaintiff's complaint also suggests that Martel had visible markings on his arm from using a needle to consume drugs.

[25] Id. at ¶¶ 41-42.

[26] Id. at ¶ 43.

Nurse Hrubiec's assessment, the nursing staff, on orders of Dr. Braga, placed Martel on the jail's "EtOH Alcohol Withdrawal Protocol."[27]

Nurse Gustafson again saw Martel in the late afternoon of May 11.  Nurse Gustafson noted Martel's reported complaints of sweats, chills, body aches, restlessness, anxiety, agitation, nausea, and vomiting and assigned him a CIWA score of 5 based on her assessment.[28]  She also charted Martel's blood pressure as 142/88 (sitting) and 144/90 (standing), indicating that he was experiencing Stage 2 hypertension.

At almost 11:00 pm that evening, Correctional Officer Samuel Mutungi stopped at Martel's cell during a security round.[29]  Officer Mutungi observed Martel laying on the mattress on the floor and asked for his name.[30]  Martel did not initially respond.[31]  Officer Mutungi then knocked on Martel's cell door and again asked for his last name.  Martel woke up and stated "Martel."[32]  Officer Mutungi then left Martel and did not report this interaction to the jail's medical staff.

Less than an hour later, a different correctional officer, Sergeant Michael Boyle, passed by Martel's cell during a security round and observed Martel laying on his back on the mattress

---

[27] Id. at ¶ 44.  The jail's alcohol withdrawal protocol includes administering medication for withdrawal symptom relief, but the plaintiff omits this fact from its complaint.

[28] Id. at ¶¶ 45-46.  In its objection to the County Defendants' motion to dismiss, the plaintiff suggests that this assessment score was either purposefully or mistakenly incorrect based on Martel's reported symptoms.  See doc. no. 27 at 7 ("the circumstances around the assessment are suspicious and troubling").

[29] Id. at ¶ 53.

[30] Id. at ¶ 54.

[31] Id.

[32] Id. at ¶ 55.

on the floor with his eyes open.[33]  Martel did not react to Sergeant Boyle shining a flashlight on him and did not respond when Sergeant Boyle called out to him.  Sergeant Boyle then entered Martel's cell and tapped him on the foot.  Martel remained unresponsive.[34]  Sergeant Boyle noticed that Martel's face was pale and his lips had a blueish tint.[35]  Sergeant Boyle then called jail staff for emergency medical assistance and instructed Officer Mutungi to retrieve an emergency services bag.[36]  Moments later, other jail staff – including Nurses Gue and Gustafson – arrived to attempt to provide life-saving care to Martel.

Staff performed cardiopulmonary resuscitation on Martel and applied an Automated External Defibrillator to his chest.[37]  Sergeant Boyle observed that Martel had blood and vomit coming from his mouth.  During this time, a jail staffer also called 911.[38]  Jail personnel was unable to revive Martel during the time it took emergency medical services responders to arrive.[39]  Shortly before midnight, American Medical Response personnel and members of the Manchester Fire Department arrived and continued life-saving measures on Martel.  These measures were unsuccessful, and Martel was pronounced dead at 12:06 am on May 12.[40]

---

[33] Id. at ¶¶ 58-59.

[34] Id. at ¶ 60.

[35] Id. at ¶ 61.

[36] Id. at ¶ 62.

[37] Id. at ¶¶ 64-65.

[38] Id. at ¶ 66.

[39] Id. at ¶ 71.

[40] Id. at ¶¶ 71-73.

New Hampshire's Deputy Chief Medical Examiner Mitchell L. Weinberg, M.D. performed an autopsy on Martel later in the day on May 12.  Dr. Weinberg opined that Martel died as a result of hypertensive heart disease, with coronary artery disease and chronic ethanol abuse as significant contributory factors.[41]

Martel's wife, as the Administrator of his estate, filed this lawsuit in November 2021.

## III.   <u>Analysis</u>

Plaintiff's Second Amended Complaint asserts the following causes of action:  (1) a claim under 42 U.S.C. § 1983 against all individual defendants for "denial of adequate medical care"; (2) a § 1983 claim for municipal liability against the County; and (3) a medical negligence claim against the nurses and AIMG Defendants.  The defendants move to dismiss all counts for failure to state a claim upon which relief can be granted.  The court addresses each count in turn, beginning with the plaintiff's civil rights claim under § 1983 for constitutionally inadequate medical care.

### A.   § 1983 claim for deliberate indifference to a serious medical need

The Eighth Amendment to the United States Constitution, as applied to state actors under the Fourteenth Amendment, prohibits inmate medical care that is "so inadequate as to shock the conscience."  Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015) (quoting Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir. 1991)).  "Prison officials, therefore, violate the Eighth and Fourteenth Amendments' prohibition against 'cruel and unusual' punishments when they exhibit 'deliberate indifference' to [an inmate's] serious medical needs."  Perry, 782 F.3d at 78 (quoting Feeney v. Corr. Med. Servs., 464 F.3d 158, 163 (1st Cir. 2006)).

---

[41] Id. at ¶¶ 74-75.

"To succeed on a claim of deliberate indifference based on inadequate or delayed medical care, 'a plaintiff must satisfy both a subjective and objective inquiry.'" Perry, 782 F.3d at 78 (quoting Leavitt v. Corr. Med. Servs., 645 F.3d 484, 497 (1st Cir. 2011)). The objective inquiry asks whether the detainee had a "serious medical need," that is, a medical need "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016). The defendants do not dispute that Martel had a serious medical need, so the court will assume for purposes of deciding this motion that the plaintiff meets this element of the deliberate indifference test.

The defendants' motions center on the subjective component, which "requires the plaintiff to show that prison officials, in treating [Martel's] medical needs, possessed a sufficiently culpable state of mind," namely, "one that amounts to deliberate indifference to [Martel's] health or safety." Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (citing Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015)). "Deliberate indifference in this context" can take several forms, and "may be shown by the denial of needed care as punishment" or that the defendant had "actual knowledge of impending harm, easily preventable," and failed to take the steps that would have prevented that harm. Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) (quoting Feeney, 464 F.3d at 162). The plaintiff can make this showing "by demonstrating that the defendant provided medical care that was 'so inadequate as to shock the conscience,'" or that was "so clearly inadequate as to amount to a refusal to provide essential care." Zingg, 907 F.3d at 635 (quoting Feeney, 464 F.3d at 162 and Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991)). "[D]eliberate indifference may also take the form of 'wanton' or criminal recklessness in the treatment afforded." Zingg, 907 F.3d at 635; see also Battista v.

10

Clarke, 645 F.3d 449, 453 (1st Cir. 2011) (noting that deliberate indifference may be shown by a "wanton disregard" to a detainee's needs).

To act, or fail to act, with deliberate indifference, "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Leavitt, 645 F.3d at 497 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). A factfinder may conclude that a prison official was aware of a substantial risk of serious harm based on circumstantial evidence that the official perceived the risk or "based on the fact that the risk was obvious." Miranda-Rivera, 813 F.3d at 74. This element therefore "requires evidence that the failure in treatment was purposeful." Kosilek v. Spencer, 774 F.3d 63, 83 (1st Cir. 2014). "[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." Ruiz-Rosa, 485 F.3d at 156 (citing Feeney, 464 F.3d at 161-62). And, even if a prison official is aware of a serious medical risk, "they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided." Burrell v. Hampshire County, 307 F.3d 1, 8 (1st Cir. 2002).

### 1.     No collective liability

The individual defendants contend that the well-plead factual allegations in the plaintiff's operative complaint, even if accepted as true and construed in the plaintiff's favor, cannot support claims for deliberate indifference against each of them. Plaintiff repeatedly couches its deliberate indifference claim in terms of the collective actions or responsibility of the "defendants." See doc. no. 41 at ¶¶ 96-99; Doc. no. 27 at 9.[42] The relevant inquiry, however, is

---

[42] Even if the court could consider the defendants' alleged collective failure to more closely and frequently monitor Martel evidence of an individual's deliberate indifference, such evidence reflects a disagreement regarding the efficacy of treatment, as opposed to an individual's

not whether the individuals are liable based on their collective actions.  Rather, the question is whether each defendant, through their "own individual actions, has violated the Constitution." Air Sunshine, Inc. v. Carl, 663 F.3d 27, 33 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)); Leavitt, 645 F.3d at 502 ("It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions.") (quoting Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)).  Thus, the individual defendants may be liable for deliberate indifference only when there is sufficient evidence from which a jury could find "that each . . . defendant was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that each defendant did, in fact, draw the inference."  Leavitt, 645 F.3d at 502 (cleaned up).  The court gauges the factual allegations as to each individual defendant against this standard.

### 2.    Nurse Bryanna Gue

Martel's incarceration at Valley Street lasted approximately 30 hours before he was found unresponsive in his cell.  Each individual defendant had limited interactions with Martel during those 30 hours.  Nurse Gue screened Martel during his booking around 9pm on May 11.[43]

---

purposeful decision to withhold or delay treatment.  The former cannot support a claim for constitutionally inadequate medical care.  See Leavitt, 645 F.3d at 503 (rejecting deliberate indifference claim based on theory that medical providers "ought to have been more proactive in following up on" the inmate's care).

[43] At oral argument on the County Defendants' motion, plaintiff's counsel urged the court to deny the motion because the main source of the allegations in his complaint – Martel's inmate medical records – were prepared by the individual nurse defendants and necessarily "self-serving" and inaccurate.  In counsel's view, discovery, namely, depositions of the individuals, would allow the plaintiff to test the accuracy of these records.  Such considerations cannot factor into the court's ruling on a motion to dismiss.  But even if the plaintiff had alleged deliberate indifference based on falsification of medical records (it did not), "[f]alsification of medical records, in and of itself, generally will not give rise to a § 1983 claim."  Smith v. Iverson, No. 8:19CV298, 2019 WL 4417548, at *11 (D. Neb. Sept. 16, 2019); see also Williams v. Bentivegna, No. 14-CV-6105-CJS, 2015 WL 162994, at *7 (W.D.N.Y. Jan. 13, 2015) (allegation that doctors wrote false information in plaintiff's medical record "might amount to malpractice,

Case 1:21-cv-00880-JL   Document 44   Filed 10/19/22   Page 13 of 35

Martel shared with Nurse Gue that he drank a bottle of vodka per day and had consumed a bottle

of vodka earlier that day.  Nurse Gue noted, however, that Martel was not showing signs of

intoxication or alcohol withdrawal.  Nevertheless, according to the plaintiff's complaint, Nurse

Gue placed Martel on alcohol detoxification watch, ordered him restricted to a lower bunk with a

mattress on the floor, limited his recreational activities, and placed him in a housing unit for

detoxing inmates.  Nurse Gue's only other interaction with Martel was her attempt to revive him

by administering an AED and Narcan after he was found unresponsive.

Plaintiff argues that Nurse Gue's failure to take Martel's vital signs and perform a

complete assessment for alcohol withdrawal symptoms during booking was deliberate

indifference.  It further argues that based on Martel's reported daily consumption of alcohol,

Nurse Gue should have recognized that Martel required a more thorough initial assessment for

withdrawal symptoms.  The court is not persuaded.  Nurse Gue did not observe Martel showing

symptoms of alcohol withdrawal or incarceration.  But even if she should have recognized that

Martel was in withdrawal, that is not enough to state a deliberate indifference claim.  See Leavitt,

645 F.3d at 503 ("Perhaps Tritch was not as aware as one would like a medical professional to

---

but not a constitutional violation"); Moore v. Casselberry, 584 F. Supp. 2d 580, 582 (W.D.N.Y.
2008) (allegation that prison nurse filed a false or incomplete inmate medical report did "not
state a federal constitutional violation"); Johnson v. Lew Sterrett Crim. Just. Ctr., No. 3:02-CV-
647M, 2003 WL 23473095, at *4 (N.D. Tex. Feb. 28, 2003) (allegation that medical director
"gave false statements about [inmate's] medical records, failed to provide reports, and lost his
medical records" were "not violations of [inmate's] constitutional rights" and did "not rise to the
level of deliberate indifference to his serious medical needs").  Moreover, while neither the
plaintiff nor the court are required to accept the accuracy of records prepared by the defendants,
the plaintiff has a duty to plead facts.  Here, the "court cannot infer from the [p]laintiff's
allegations any improper motive[s] of" the nurses in preparing Martel's treatment records or any
indication that the nurses falsified the records out of deliberate indifference to Martel's serious
medical needs.  Wiley v. Hamik, No. 8:20CV160, 2020 WL 3100190, at *2 (D. Neb. June 11,
2020).

13

be, but 'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment,' let alone punishment cruel and unusual.") (quoting Farmer, 511 U.S. at 838).

Nurse Gue nevertheless responded reasonably to Martel's reported alcohol consumption. Even though Martel was not showing signs of withdrawal or intoxication, she placed him on detox watch as a precautionary measure. Such reasonable, good faith actions cannot support a deliberate indifference claim. See Kosilek, 774 F.3d at 92 (finding no deliberate indifference where decision fell "within the realm of reason and [was] made in good faith") (quoting Battista v. Clarke, 645 F.3d 449, 454 (1st Cir. 2011)). And the plaintiff has not alleged that Nurse Gue missed a scheduled assessment of Martel, ignored Martel's request for medical attention, or otherwise refused to see him.

Moreover, it is unclear from the complaint what a more-through initial assessment would have shown or importantly, whether it would have improved Martel's condition. And since Nurses Hrubiec and Gustafson later took Martel's vitals, assessed him, and then reacted, it would be unreasonable to infer that Nurse Gue's initial failure to take vitals and fully assess Martel could have caused his death. While a plaintiff does not have to prove at the pleadings stage that the nurse's alleged deliberate indifference caused Martel's demise and death, the plaintiff here does not allege in the operative complaint (despite several opportunities to amend) that a more thorough health assessment during booking would have prevented Martel's demise. In fact, the medical examiner did not identify withdrawal from alcohol as a cause of Martel's death and the plaintiff admits in its objection to the motion to dismiss that it has not retained an expert to

render an opinion as to causation, only that it "expects" to prove that these alleged failures caused Martel's death.[44]

At best, the allegations against Nurse Gue suggest a disagreement as to the appropriateness of her treatment.  Such disagreements, however, cannot form the basis for a deliberate indifference claim.  See DesRosiers v. Moran, 949 F.2d 15, 20 (1st Cir. 1991) ("[A] claim of inadequate medical treatment which reflects no more than a disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment."); Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir. 1980) (holding that "disagreement on the appropriate course of treatment . . . may present a colorable claim of negligence[ ] but . . . falls short of alleging a constitutional violation"); Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981) ("where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law").  The court grants the County Defendants' motion to dismiss Count 1 against Nurse Gue.

---

[44] Although the court is not dismissing the plaintiff's federal claims due to a failure to plead causation, had the claims withstood the defendants' motions to dismiss, the plaintiff would have faced a steep climb to cross the necessary evidentiary threshold on causation given the medical examiner's report.  As with the medical records, plaintiff's counsel repeated its theory at oral argument that the medical examiner's report could be incomplete or incorrect as to Martel's cause of death and that a deposition could test the accuracy of the report.  That does not answer the question of whether the plaintiff has sufficiently plead causation.  Instead, the plaintiff's causation theory at both oral arguments was effectively, "I haven't hired my own expert yet, but I'll be able to prove this.  Death from alcohol withdrawal is common."  While again, a lack of causation allegations is not the basis for this court's dismissal, counsel's candid admission that the plaintiff's case is not yet supported by an expert causation opinion in any form does not engender confidence.

### 3.      Nurse Katelyn Hrubiec

Nurse Hrubiec's involvement with Martel was similarly limited.  Just over 12 hours after

Martel was booked, Nurse Hrubiec assessed him and observed him experiencing several

withdrawal symptoms.  She also learned of his daily alcohol consumption and fentanyl use.  In

response, Nurse Hrubiec recorded Martel's vital signs and assessed him under the CIWA scale,

which resulted in a score of "13," suggesting mild to moderate withdrawal symptoms.  Following

this assessment, Nurse Hrubiec contacted the responsible physician – Dr. Braga – and Dr. Braga

ordered Martel placed on the jail's "withdrawal protocols."[45]

Like the other nurses, Nurse Hrubiec's actions and response to learning about Martel's

condition were reasonable and consistent with the jail's protocols for treating inmates

experiencing alcohol withdrawal.  She assessed Martel during her shift, scored him under the

required CIWA scale and following this assessment, she notified the responsible provider, Dr.

Braga, who initiated the withdrawal protocols.  The withdrawal protocols include administering

medication to inmates to relieve their withdrawal symptoms.[46]  Importantly, the plaintiff does not

allege that Nurse Hrubiec missed a required evaluation during one of her shifts, ignored Martel's

request for medical attention, or otherwise refused to treat him.  Plaintiff instead baldly

concludes that the nurses (collectively, not individually) failed to "closely and frequently"

monitor Martel, as required by jail policy, but does not allege how Nurse Hrubiec or any of the

---

[45] Based on the fact that Dr. Braga placed Martel in the withdrawal protocol almost immediately
after Nurse Hrubiec assessed him, the court can reasonably infer that Nurse Hrubiec contacted
Dr. Braga and reported the results of her assessment, leading to Dr. Braga placing Martel in the
protocol.  See doc. no. 41 at ¶ 94.

[46] Plaintiff omits this fact, and the fact that Martel received medication for his withdrawal
symptoms after Dr. Braga initiated the withdrawal protocols, from its complaint.  Because they
are not included in the operative complaint, the court does not consider these facts for purposes
of ruling on the County Defendants' motion to dismiss.

other individual defendants failed to follow policy.[47]  The court thus grants the County

Defendants' motion to dismiss Count 1 against Nurse Hrubiec.

### 4.     Nurse Erica Gustafson

Out of all the individual defendants, Nurse Gustafson interacted with Martel the most.  A

few hours after Martel was booked and placed on detox watch, Nurse Gustafson visited his cell,

noted that he was at risk for detox and attempted to assess him, but he refused.  Many hours later,

after Nurse Hrubiec assessed Martel and assigned him a CIWA score of 13, Nurse Gustafson

visited him again, took his vital signs, assessed him, and assigned him a CIWA score of "5."

And after Martel was found unresponsive, Nurse Gustafson attempted life-saving measures with

other jail staff.

The court similarly concludes that Nurse Gustafson's actions cannot support a deliberate

indifference claim.  In Nurse Gustafson's first interaction with Martel, he refused treatment.  As

far as the court can tell, the law does not require a nurse to force treatment on an inmate under

those circumstances.  Plaintiff has not identified, and the court's research has not uncovered, any

decision where a court found that a nurse's refusal to force medical treatment on an inmate

constituted deliberate indifference.  It instead argues that Nurse Gustafson's alleged failure to

inform Martel of the consequences of refusing treatment was deliberate indifference.[48]  Even

accepting the plaintiff's allegation that Nurse Gustafson failed to inform Martel of the

consequences of refusing treatment, the plaintiff does not allege – and the court cannot infer

from the complaint – that she purposefully withheld this information from Martel.  Such a failure

---

[47] See doc. no. 41 at ¶¶ 97-98.

[48] See id. at ¶ 98.  While the plaintiff directs this allegation at the "defendants," the court can infer from the allegations against Nurse Gustafson that this allegation is directed specifically at her.

to inform is thus "tantamount to a dispute over the exercise of professional judgment and insufficient to support a constitutional claim."  Leavitt, 645 F.3d at 503.

In her second interaction with Martel, Nurse Gustafson noted his symptoms, took his vital signs, and scored him a "5" on the CIWA scale.  Martel had previously scored a "13" on the scale, suggesting mild to moderate alcohol withdrawal.  Plaintiff argues that Nurse Gustafson's score was too low based on Martel's symptoms and that she devalued, and refused to acknowledge and act upon, his allegedly "worsening symptoms and vital signs."  Assuming Nurse Gustafson's score of 5 was incorrect and too low, that mistake does not support a deliberate indifference claim.  If Nurse Gustafson should have scored Martel's symptoms at 11, that does not objectively show that his condition was worsening.[49]  If anything, it shows that his condition was improving slightly (from scoring 13 in his prior assessment to scoring lower many hours later).

Plaintiff does not allege what else it thinks Nurse Gustafson should have done under these circumstances.  Dr. Braga, the responsible physician, was already aware of Martel's condition and placed him in the withdrawal protocol.  Like the other nurses, the plaintiff does not allege that Martel requested treatment from Nurse Gustafson, and she refused.  Its allegations instead reflect a disagreement about the course of treatment, as opposed to facts suggesting a deliberate choice to withhold necessary and appropriate care, or delay such care.  Moreover, while not dispositive for purposes of this order, as with the other individual defendants, the plaintiff's complaint is devoid of any allegation that a specific act or omission by Nurse

---

[49] Plaintiff alleges that Martel's blood pressure had worsened from Stage 1 hypertension when Nurse Hrubiec evaluated him to Stage 2 hypertension when Nurse Gustafson evaluated him.  But the complaint does not allege or explain the medical significance of such worsening, allege what Martel's other vital signs were, or allege whether those signs were improving or worsening during the course of his incarceration.

Gustafson caused Martel's death.  The court therefore grants the County Defendants' motion to dismiss Count 1 against Nurse Gustafson.[50]

### 5.    Officer Samuel Mutungi

Like the nurse defendants, Officer Mutungi's interaction with Martel was limited. During a routine security check around 11pm on May 11, Officer Mutungi passed by Martel's cell, called out to him, and when Martel did not initially respond, Officer Mutungi knocked and woke Martel up.  After Martel woke up, he stated his last name to Officer Mutungi, and Officer Mutungi left.  Plaintiff faults Officer Mutungi for not reporting this interaction to the jail's medical staff.

The court cannot infer deliberate indifference from this interaction.  Perhaps moving on without obtaining a response from Martel could have constituted deliberate indifference, but that is not what happened here.  Because Officer Mutungi is not a medical provider, he was not in a position to medically assess Martel and could rely on the jail's medical staff to make such assessments.  See Snell v. Neville, 998 F.3d 474, 498 (1st Cir. 2021) (noting that correctional officers "had no reason to expect Snell needed [medical assistance] given their justifiable reliance on the medical opinions of Dr. Ruze and other health care professionals who treated Snell") (citing Matthews v. Pa. Dept. of Corr., 613 F. App'x 163, 170 (3d Cir. 2015) ("[N]on-medical prison officials are generally justified in relying on the expertise and care of prison medical providers. Absent a reason to believe (or actual knowledge) that prison doctors or their

---

[50] At oral argument on the County Defendants' motion, plaintiff's counsel raised a new theory of deliberate indifference liability against the nurses not alleged in its complaint:  specifically, that LPNs are not qualified to perform CIWA assessments.  Such a theory, even if it had been alleged and the court could consider it, cannot support a deliberate indifference claim.  See Torraco, 923 F.2d at 235 (failure to provide psychiatric care to suicidal inmate, as opposed to care from a psychologist, was not a sufficiently dangerous omission to raise an inference of deliberate indifference to the inmate's mental health and safety needs).

assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." (ellipsis in original) (internal citation and quotation marks omitted) (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004))); see also Giles v. Godinez, 914 F.3d 1040, 1049 (7th Cir. 2019) ("We have long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment."). The complaint also contains no allegation that Officer Mutungi failed or declined to follow any jail protocols.

Based on what Officer Mutungi observed (essentially, Martel sleeping on the floor at a time of night when someone would be expected to be sleeping) and did (waking Martel up by knocking on his cell), no reasonable inference can be drawn that Officer Mutungi was aware (or that it was obvious) that Martel's condition was worsening and medical intervention was needed, or that he should have notified the nurses. See Kosilek, 774 F.3d at 92 (finding no deliberate indifference where decision fell "within the realm of reason and made in good faith"). The court grants the County Defendants' motion to dismiss Count 1 as to Officer Mutungi.

### 6.   Christopher Braga, M.D.

Plaintiff's allegations about Dr. Braga's direct involvement in Martel's care are scarce. It alleges that Dr. Braga initiated the jail's alcohol withdrawal protocols shortly after learning of Martel's condition from Nurse Hrubiec.[51] These protocols involve administering medication to treat the symptoms of alcohol withdrawal. That is the extent of Dr. Braga's involvement in Martel's medical care, and the plaintiff does not allege that Dr. Braga failed or refused to treat Martel when given an opportunity to do so.

---

[51] See doc. no. 41 at ¶ 94.

Plaintiff alleges that Dr. Braga acted "intentionally, maliciously, and sadistically, with deliberate indifference" to Martel's constitutional rights, and characterizes his conduct as "outrageous" and conscience shocking.[52]  The court cannot, however, credit such "bald assertions, subjective characterizations and legal conclusions" at the motion to dismiss stage. DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999).  Beyond the conclusory allegations, the plaintiff suggests that Dr. Braga was deliberately indifferent by failing to:  (1) physically examine or assess Martel for withdrawal symptoms; (2) review his medical records; and (3) "independently inquire" with the nursing staff about Martel's condition. These alleged failures to follow up on Martel's care amount to non-actionable disagreement as to the level of care, which "can be characterized, in the best light for the non-movant, as negligence; [but do] not rise to the level of a 'deliberate indifference' claim." Bowen, 966 F.2d at 17; Leavitt, 645 F.3d at 503 (rejecting deliberate indifference claim based on theory that third-party correctional medicine providers "ought to have been more proactive in following up on" the inmate's care); see also DesRosiers, 949 F.2d at 20; Ferranti, 618 F.2d at 891; Layne, 657 F.2d at 474.

The allegations against Dr. Braga do not amount to a complete denial of care.  Rather, upon learning of Martel's condition, Dr. Braga responded in a timely manner (as he was required to do under AIMG's contract with the County) by initiating the withdrawal protocols.  The court therefore cannot find that Dr. Braga's response was unreasonable.  See Giroux v. Somerset Cnty., 178 F.3d 28, 32 (1st Cir. 1999) (quoting Farmer, 511 U.S. at 844) ("Even if prison officials know of a substantial risk to inmate health or safety but fail to prevent the harm, they

---

[52] Id. at ¶¶ 101-02; see also id. ¶ 96 (alleging that "defendants" – without specifying which defendants – "failed to timely and adequately assess and monitor Martel's condition and failed to adequately treat Martel for alcohol and drug withdrawal").

'may be found free from [deliberate indifference] liability if they respond reasonably to the risk.'").  Plaintiff has failed to state an actionable deliberate indifference claim against Dr. Braga for all of these reasons.

### 7. Christopher Schwieger, PA-C

As for PA Schwieger, the complaint is devoid of any allegation that he treated Martel or knew of Martel's alleged condition.  Absent allegations from which the court could even infer such knowledge or involvement in Martel's care, the plaintiff's § 1983 claim against PA Schwieger has no merit.  See Braga v. Hodgson, 605 F.3d 58, 61 (1st Cir. 2010) (granting summary judgment on deliberate indifference claim against prison official because the record "showed absolutely no evidence of the [defendant's] personal involvement with or knowledge of [the inmate's] medical care"); Webb v. Howard, No. CIV. 09-40048-FDS, 2013 WL 6835981, at *3 (D. Mass. Dec. 20, 2013) ("In this case, the record shows that defendants were not personally involved in plaintiff's treatment. Neither defendant was one of plaintiff's treating physicians or physical therapists.  There is no evidence that Howard knew about plaintiff's injuries or complaints, and therefore she cannot be held liable for any Eighth Amendment violations resulting from a lack of medical care.").

Plaintiff instead argues that Dr. Braga's knowledge of Martel's condition should be imputed to PA Schwieger.  Plaintiff presents no legal authority for this theory.  Moreover, to the extent that the plaintiff contends that PA Schwieger "should have known" about Martel's condition due to Dr. Braga's knowledge or the general risks facing inmates at Valley Street, such allegations are "insufficient" to show deliberate indifference.  Alsina-Ortiz v. Laboy, 400 F.3d 77, 82 (1st Cir. 2005); see also Farmer, 511 U.S. at 837 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot. . . be condemned as the infliction of punishment" under the Eighth Amendment."); Leite

v. Goulet, No. 15-CV-280-PB, 2018 WL 3057740, at *8 (D.N.H. June 20, 2018) (Barbadoro, J.),

aff'd sub nom. Leite v. Bergeron, 911 F.3d 47 (1st Cir. 2018) ("Under these circumstances, her

awareness of a general risk facing all inmates at all times, without more, is simply not enough to

establish the subjective knowledge required for the deliberate indifference standard.").[53]

### 8.  Supervisory liability and willful blindness

Unable to state a deliberate indifference claim based on PA Schwieger or Dr. Braga's

limited involvement in Martel's care, the plaintiff argues that AIMG's generalized, "systemic"

failures at Valley Street caused Martel's death.  Plaintiff describes these theories of liability as

some combination of supervisory liability and willful blindness.

Supervisory liability "under section 1983 has two elements."  Parker v. Landry, 935 F.3d

9, 14 (1st Cir. 2019).  First, there must be a showing "that 'one of the supervisor's subordinates

abridged the plaintiff's constitutional rights.'"  Id. (quoting Guadalupe-Báez v. Pesquera, 819

F.3d 509, 514 (1st Cir. 2016)) (additional citations omitted).  Second, there must be "an

affirmative [causal] link between the abridgement and some action or inaction on the

supervisor's part."  Parker, 935 F.3d at 14 (internal citations omitted).  "This causation

requirement can be satisfied even if the supervisor did not participate directly in the conduct that

violated a citizen's rights; for example, a sufficient casual nexus may be found if the supervisor

---

[53] As mentioned previously, the scope of plaintiff's pre-suit fact investigation or what discovery might reveal play no role in the court's consideration of a motion to dismiss under Rule 12(b)(6). But for clarification, and in response to the plaintiff's contention that discovery was needed to test the accuracy of Martel's medical records from the jail, the court asked plaintiff's counsel at the second oral argument what discovery would show in this case and what information or documents he sought prior to filing suit.  Counsel responded that he did not submit a Freedom of Information Act or other public records request to the County prior to filing suit, and that he believed discovery would provide "more information" on the AIMG Defendants and allow him to depose the nurses about certain decisions they made with respect to Martel's care.  After this colloquy, it remains unclear to the court that this additional, unspecified information would help fill the significant factual gaps in the plaintiff's now second amended complaint.

knew of, overtly or tacitly approved of, or purposely disregarded the conduct." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581–82 (1st Cir. 1994).  "A causal link may also be forged if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations."  Id.  "[I]solated instances of unconstitutional activity," however, "ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference."  Id. at 582.

Supervisory liability under § 1983 generally arises in three ways:  (1) "the supervisor may be a 'primary violator or direct participant in the rights-violating incident,'"; (2) "liability may attach 'if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation[,]'" Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (quoting Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999)); or (3) the supervisor's behavior may be deliberately indifferent "by formulating a policy, or engaging in a custom, that leads to the challenged occurrence." Maldonado-Denis, 23 F.3d at 581–82.  "Deliberate indifference" requires a plaintiff to "allege '(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk.'" Justiniano v. Walker, 986 F.3d 11, 20 (1st Cir. 2021) (quoting Camilo-Robles, 151 F.3d at 7).  Indeed, "[m]ere negligence will not suffice: the supervisor's conduct must evince 'reckless or callous indifference to the constitutional rights of others.'" Guadalupe-Báez, 819 F.3d at 515 (quoting Febus-Rodríguez v. Betancourt-Lebrón, 14 F.3d 87, 92 (1st Cir. 1994)).

Relatedly, the plaintiff may state a § 1983 claim by alleging facts that show the AIMG providers willfully blinded themselves to the risk of serious harm posed by Martel's serious

medical need.  See Bowen v. City of Manchester, 966 F.2d 13, 17 (1st Cir. 1992) ("Deliberate

indifference requires a showing by the plaintiff that the public official had actual knowledge, or

was willfully blind, to the serious risk that a detainee would commit suicide.") (emphasis added);

Manarite By & Through Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992)

(describing mental state for deliberate indifference claim as "recklessness ... in the appreciably

stricter criminal-law sense, requiring actual knowledge [or willful blindness] of impending harm,

easily preventable") (quoting DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)) (alteration

in original).

     A showing of willful blindness requires some allegation of intentional conduct and "a

level of culpability higher than a negligent failure to protect from" the risks of serious medical

needs.  Bowen, 966 F.2d at 17 (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024 (3d

Cir. 1991)). Thus, "it is not enough for plaintiff to [allege] that [Dr. Braga or PA Schwieger]

reasonably should have known of [the] risk[s]" associated with Martel's serious medical needs.

Jones v. McKenzie, No. 10-CV-152-JL, 2011 WL 6300679, at *5 (D.N.H. Dec. 16, 2011)

(quoting Wallis v. City of Worcester, No. 03-11318, 2007 WL 690050, at *4 (D. Mass. Mar. 1,

2007)).

     In support of these theories – alleged for the first time in its Second Amended Complaint

– the plaintiff contends that Dr. Braga and PA Schwieger "willfully blinded themselves to the

substantial risk of serious harm" that Martel faced by:  (a) intentionally avoiding learning

information about Martel's health needs; (b) inadequately supervising and overseeing the nursing

staff with indifference to "the possibility that deficient performance of [the nurses'] health care

duties may eventually contribute to a civil rights" violation[54]; (c) continuously failing to

adequately train the nurses, despite knowing that the nurses were inadequately trained[55]; and (d)

"purposefully, and in bad faith, setting up a system of care intended to neglect inmates and allow

them to suffer."[56]

These allegations, and every reasonable inference drawn therefrom, do not support

constitutional claims under supervisory liability or willful blindness theories for several reasons.

First, assuming that a supervisory relationship existed[57] between the AIMG providers and

the nurses, the supervisory liability claim fails because, as discussed above, the nurses here did

not violate Martel's constitutional rights.  Sanchez, 590 F.3d at 50 n. 9 ("Because we find there

to be no underlying constitutional violation arising from the strip and x-ray searches of plaintiff,

the claims of supervisory liability arising from those searches must fail."); McInnis v. Maine,

638 F.3d 18, 22 n. 4 (1st Cir. 2011) (finding "no basis for liability on the part of the primary

---

[54] Plaintiff also faults AIMG for relying on the nursing staff "to initiate the withdrawal protocols and standing orders and notify one of the AIMG providers if an inmate's medical condition worsens or requires more involved treatment."  See doc. no. 41, at ¶ 91.

[55] Plaintiff alleges that the AIMG providers met with the jail's nursing staff in 2016 to "discuss detox procedures, opiate misuse disorder in jail settings, and other issues relating to inmate medical care at the jail," but otherwise conducted no formal training programs with the nurses. Id. at ¶ 89.  Dr. Braga and PA Schwieger instead occasionally provided informal education to the nurses by offering on-the-job feedback and answering questions.  Id. at ¶ 90.

[56] Id. at ¶ 95.  For example, the plaintiff alleges that the AIMG providers should have been required to spend more than 12 hours per week on site, and even if 12 hours was minimally sufficient, they regularly failed to meet that threshold, as required by AIMG's contract with the County.  Id. at ¶¶ 84-85.  Plaintiff calls this a "fundamentally flawed and limited amount of time," but does not allege that it is constitutionally inadequate.  Id. at ¶ 84.

[57] This is a generous assumption considering that the plaintiff fails to allege what supervisory authority (if any) the AIMG providers exercise over the County nurses.

officers [or] supervisors" absent an underlying constitutional violation by the subordinate

officers).  The court must dismiss the plaintiff's supervisory liability claim on that basis alone.

Second, even assuming that the plaintiff stated claims of underlying constitutional

violations against the nurses, its inadequate oversight and training claims still fail because the

"non-conclusory, non-speculative" factual allegations do not "support the essential legal

element[] of [Dr. Braga or PA Schwieger's] reckless or callous indifference to the constitutional

rights of others."  Justiniano, 986 F.3d at 21-22 (quotations omitted).  Indeed, the complaint

assumes that the AIMG providers had a contractual responsibility to train the County nurses and

concludes, without any factual support, that any training was "inadequate" and the AIMG

providers knew it and "continuously failed" to remedy it.[58]  Even if the court accepted as true the

plaintiff's conclusory allegation that the nurses' training was inadequate and the AIMG providers

knew it, "knowledge of earlier inadequate training . . . is a mile away from showing willful

blindness or deliberate indifference to a supposed continued failure of training."  Alsina-Ortiz,

400 F.3d at 82.  Plaintiff has pled no facts that show the AIMG providers knew or willfully

blinded themselves to the fact that the "training regime . . . had failed on a large scale."  Id.; see

also Justiniano, 986 F.3d at 22 ("The complaint does not plead that [the subordinate] or the

Massachusetts State Police more generally had a history of using excessive and constitutionally

violative force against individuals who were mentally ill such that [the supervisor] should have

been on notice of that conduct, nor is there any suggestion that the Massachusetts State Police

are otherwise specifically at risk of violating a mentally ill individual's constitutional rights.").

Instead, the plaintiff alleges that the AIMG providers – not the nurse defendants here –

were the subject of two other lawsuits filed against them in 2020 by the estates of former

---

[58] Doc. no. 41, at ¶ 95.

inmates.[59]  Those lawsuits, however, resulted in the court dismissing the plaintiffs' § 1983

deliberate indifference claims against the AIMG providers, so their relevance to the plaintiff's

present claim is unclear at best.  See Sept. 1, 2020 Order Granting AIMG Providers' Motion to

Dismiss in Rancourt v. Hillsborough Cty., Docket No. 20-cv-00351-PB; Sacco v. Am.

Institutional Med. Grp., No. 1:20-CV-447-JL, 2022 WL 2194589 (D.N.H. June 17, 2022).

Unproven allegations in two dismissed lawsuits could not put the AIMG providers "on

luminously clear notice that [they] might become liable, in [their] supervisory capacity," should

their current practices continue.  Guadalupe-Baez, 819 F.3d at 517 (holding that allegations in a

DOJ report detailing "rampant constitutional violations" by members of a police department

were sufficient to state constitutional supervisory liability claim against police superintendent).

 The same is true of plaintiff's allegation that the AIMG providers inadequately oversaw

the nurses' implementation of the jail's withdrawal protocols and procedures.  To start, the

plaintiff does not allege that the jail's alcohol withdrawal protocols, procedures, or standing

orders were constitutionally deficient on their face.  Rather, it parrots the elements of the claim

and concludes that the AIMG providers "over[saw] Valley Street Jail nurses with a deliberate

indifference toward the possibility that deficient performance of their health care duties may

eventually contribute to a civil rights deprivation."  Doc. no. 41, at ¶ 95.  "The deliberate

indifference required to establish a supervisory liability/failure to train claim cannot plausibly be

inferred from the mere existence of a poorly-implemented [policy] and a bald assertion that the

[plaintiff's injury] somehow resulted from [that policy]."  Sanchez, 590 F.3d at 49–50.  That is

precisely what the plaintiff attempts to do here.

---

[59] Id. at ¶¶ 86-87.

Nor has the plaintiff alleged a "specific grave risk of harm" that would result from these alleged, unspecified inadequacies in training or oversight, or that there were "easily available measures" for the AIMG providers to take to address that risk, but did not.  Camilo-Robles, 151 F.3d at 7; see also Rodrigues v. Furtado, 950 F.2d 805, 813 (1st Cir. 1991) (explaining that "an arguable 'weakness in police training [or supervision does] not amount to a 'policy of failure to train arising from deliberate indifference to citizens' constitutional rights.'") (quoting Burns v. Loranger, 907 F.2d 233, 239 (1st Cir. 1990)).  Plaintiff also fails to assert what additional training or oversight the AIMG providers could have implemented and how, if at all, that could have changed Martel's fate.  There are simply "too many pieces missing, even with the benefit of some inferential leaps, for [the court] to conclude" that the plaintiff has sufficiently pled the "deliberate indifference" aspect of its failure to supervise claim.  Justiniano, 986 F.3d at 22.

Plaintiff has likewise failed to allege facts from which the court can reasonably infer "an affirmative [causal] link between the" the nurses' alleged unconstitutional conduct and "some action or inaction on the [the AIMG providers'] part."  Parker, 935 F.3d at 14 (internal citations omitted).  Plaintiff instead alleges that the defendants' conduct (without specifying which defendants or what conduct) "was the direct and proximate cause" of Martel's death.[60]  Such "tenuous assertions strung together by strands of speculation and surmise" are insufficient to satisfy a plaintiff's pleading obligation.  Maldonado-Denis, 23 F.3d at 583; see also Justiniano, 986 F.3d at 23 (finding similar conclusory allegation that, "[a]s a direct result of the conduct of Defendant Alben, Wilfredo Justiniano lost his life," insufficient to plead causation).  Plaintiff's complaint is also missing any allegations of a "known history of widespread abuse sufficient to

---

[60] Doc. no. 41, at ¶ 102.  Plaintiff does not address the causation element of its supervisory liability claim in its objection to the AIMG Defendants' motion to dismiss.

alert a supervisor to ongoing violations," from which the court could arguably infer causation.
Guadalupe-Baez, 819 F.3d at 515 (quoting Maldonado-Denis, 23 F.3d at 582)).  In sum, the
court concludes that even "[w]ith the benefit of every possible doubt," the plaintiff's complaint
fails to allege sufficient facts to satisfy the "exceptionally stringent" "liability criteria" for
establishing constitutionally inadequate supervision or training.  Justiniano, 986 F.3d at 20, 21
(quoting Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998)).

Lastly, to the extent the plaintiff attempts to state a standalone deliberate indifference
claim based on the AIMG providers' alleged willful blindness, that claim fails as well.  Aside
from legal conclusions couched as facts, the plaintiff's complaint contains no factual allegations
from which the court can infer that Dr. Braga or PA Schwieger intentionally avoided learning
information about Martel's health needs or purposefully refused to provide care.  See Alsina-
Ortiz, 400 F.3d at 82 (willful blindness is "directed at a form of scienter in which the official
culpably ignores or turns away from what is otherwise apparent").  If anything, the allegations
show that Dr. Braga (the only AIMG provider with actual knowledge of Martel's condition)
responded to learning about Martel's health needs by ordering further treatment.

9.    **Additional observation**

While not controlling here, the court notes that other courts have reached similar
conclusions in deliberate indifference cases involving inmates withdrawing from alcohol and
drugs.  See, e.g., Strain v. Regalado, 977 F.3d 984 (10th Cir. 2020) (no deliberate indifference to
symptoms of alcohol withdrawal where detainee was admitted to jail's medical unit the day he
complained of alcohol withdrawal symptoms, staff conducted multiple assessments of detainee's
condition, and gave him medication, even if nurses were negligent in failing to check his vital
signs and physicians delayed ordering heightened care for his symptoms); Murphy v. Wexford
Health Sources Inc., 962 F.3d 911, 916–17 (7th Cir. 2020) (concluding that a provider's decision

to deviate from the applicable standard of care by treating a withdrawing inmate in the prison's healthcare unit rather than transferring him to "an appropriate hospital setting" suggests negligence rather than deliberate indifference).[61]

In one case where a court allowed a deliberate indifference claim involving a withdrawing inmate or detainee to advance past the motion to dismiss stage, the alleged misconduct was distinguishable and more egregious than here.  See Imhoff v. Temas, 67 F. Supp. 3d 700 (W.D. Pa. 2014).  The detainee in Imhoff alleged that he informed facility personnel of his extensive drug use, repeatedly requested medical assistance when he began experiencing seizures and hallucinations in conjunction with his drug withdrawal in the presence of facility personnel, and despite all of that, jail medical staff provided no medical treatment for at least eight days.  The same cannot be said of Martel's brief, but ultimately tragic, incarceration at Valley Street.

### B.   Monell liability

Count 2 of the plaintiff's complaint asserts a § 1983 claim against the County for the allegedly unconstitutional conduct of the nurses and Officer Mutungi.  A municipal entity

---

[61] See also Freeland v. Tarrant County, Texas, 789 Fed. Appx. 406 (5th Cir. 2019) (County did not act with deliberate indifference to inmate's serious medical condition, even though he died as result of alcohol withdrawal symptoms, where inmate was placed in alcohol-detoxification program upon booking, his alcohol withdrawal symptoms were monitored and assessed, he subsequently received medical attention, treatment, and medication, there was no indication that county disregarded substantial risk of his alcohol withdrawal and avoided reasonable measures to abate it, and county did not wait for manifest emergency before providing medical attention); Greene v. Crawford County, Michigan, 22 F.4th 593 (6th Cir. 2022) (County jail officers did not recklessly disregard medical needs of detainee who experienced delirium tremens and later died at county jail of complications from alcohol withdrawal by failing to obtain or render basic medical care for detainee, where officers did not witness detainee's delirium tremens, hallucinations, or other abnormal behavior, and they were otherwise unaware of the seriousness of detainee's condition).

"cannot be held liable solely because it employs a tortfeasor[.] . . . [I]n other words, a municipality cannot be held liable under § 1983 on a respondent superior theory." Collins v. Harker Heights, 503 U.S. 115, 121 (1992) (quoting Monell, 436 U.S. at 691). Instead, "[a]ssessing liability against the [County] requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the [County] be responsible for that violation, an element which has its own components." Young v. City of Providence, 404 F.3d 4, 25–26 (1st Cir. 2005) (citing Collins, 503 U.S. at 120). In order to maintain a § 1983 claim against the County, the plaintiff must prove that "action pursuant to official municipal policy of some nature," or municipal custom or practice, "caused a constitutional tort." Monell, 436 U.S. at 691, 694.

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011). "In limited circumstances, a local government's decision not to train [or inadequate training of] certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Id.; see also Oklahoma City v. Tuttle, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell"). Because a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," however, the liability criteria for such claims are stringent, and "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick, 563 U.S. at 61 (quoting City of Canton v. Harris, 489 U.S. 378, 388–89, 391 (1989)).

The plaintiff bases its Monell claim on both a "de facto or de jure" policy as well as a failure to properly train.  The court need not address the substance of these theories, however, because, as found above, the allegations in the plaintiff's complaint fail to support a constitutional tort or violation by the individual County defendants.  As the Supreme Court of the United States has recognized, "[n]either Monell . . . , nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."  City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); see also Robinson v. Cook, 706 F.3d 25, 38 (1st Cir. 2013) ("Similarly, policy or practice aside, a municipality cannot be liable for the actions of its officials under Monell if those actions "inflicted no constitutional harm."") (quoting Heller, 475 U.S. at 799); Calvi v. Knox County, 470 F.3d 422, 429 (1st Cir. 2006) ("It follows that the inadequate training of a police officer cannot be a basis for municipal liability under section 1983 unless a constitutional injury has been inflicted by the officer or officers whose training was allegedly inferior."); Jarrett v. Town of Yarmouth, 331 F.3d 140, 151 (1st Cir. 2003) ("Our determination that Jarrett suffered no constitutional injury is dispositive of his municipal liability claim against the Town of Yarmouth").

Accordingly, because the operative complaint fails to state a viable claim that any of the individual defendants violated Martel's constitutional rights, the plaintiff's claim against the County for having maintained a constitutionally deficient custom or policy or for inadequate training necessarily fails.  Leavitt, 645 F.3d at 504 ("Where, as here, there is no constitutional violation by the employees of the municipality, there can be no liability predicated on municipal policy or custom.").

### C.     Medical negligence

Lastly, the plaintiff asserts a medical negligence claim against the County nurses and

AIMG Defendants.  It alleges that these defendants, as healthcare professionals, owed a duty to

Martel to "provide him with reasonable and proper medical care in accordance with the

applicable standard of care" and breached that duty.  The nurse defendants argue that they are

immune from the plaintiff's negligence claim under New Hampshire's governmental employee

immunity statute.  The AIMG Defendants ask the court to decline to exercise supplemental

jurisdiction over the negligence claim if it dismisses the federal claim.  They also argue that the

plaintiff's allegations are insufficient to state a negligence claim on the merits.  The court does

not reach the immunity or merits arguments because, following dismissal of the plaintiff's

federal claims, it declines to exercise supplemental jurisdiction over the remaining state law

claim.

### 1.     Supplemental jurisdiction over the plaintiff's negligence claim

"As a general principle, the unfavorable disposition of a plaintiff's federal claims at the

early stages of a suit, well before the commencement of trial, will trigger the dismissal without

prejudice of any supplemental state-law claims."  Rodriguez v. Doral Mortg. Corp., 57 F.3d

1168, 1177 (1st Cir. 1995); see also Mine Workers of America v. Gibbs, 383 U.S. 715, 726

(1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be

dismissed as well.").  That is because in those circumstances, "the balance of factors to be

considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness,

and comity – will point toward declining to exercise jurisdiction over the remaining state-law

claims."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

While the court may use its discretion to "retain jurisdiction over state-law claims

notwithstanding the early demise of foundational federal claims," that is usually reserved for

34

situations where the statute of limitations may preclude a separate suit in state court or "when the state law that undergirds the nonfederal claim is of dubious scope and application." Rodriguez, 57 F.3d at 1177. Neither factor is present here, so at this early stage in the litigation, the court will follow the usual course and decline to exercise supplemental jurisdiction over the plaintiff's remaining state law negligence claim. That claim is accordingly dismissed without prejudice.

## IV.  Conclusion

For the reasons set forth above, the County Defendants' motion to dismiss[62] and the AIMG Defendants' motion to dismiss[63] are GRANTED. Plaintiff's negligence claim is dismissed without prejudice to re-filing in the appropriate state court. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: October 19, 2022

cc:     Lawrence A. Vogelman, Esq.
        Brittani Schanstine, Esq.
        Donald L. Smith, Esq.
        Todd J. Hathaway, Esq.
        Abby Tucker, Esq.

---

[62] Doc. no. 18.

[63] Doc. no. 42.